UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| JESSICA COTE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:14-cv-00347-JAW |
| | ) | |
| T-MOBILE USA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON MOTION FOR SUMMARY JUDGMENT**

Jessica Cote claims that T-Mobile USA, Inc. interfered with her taking medical leave and also terminated her employment in retaliation for her taking medical leave, thus violating the Family Medical Leave Act and the Maine Family Medical Leave Act.  T-Mobile USA, Inc. moved for summary judgment, claiming that it terminated Ms. Cote for reasons unrelated to her medical leave and that it did not interfere with her right to use medical leave.  The Court concludes that Ms. Cote defeats the motion for summary judgment on the federal and state retaliation claims, because there are genuine issues of material fact as to whether T-Mobile USA, Inc. terminated Ms. Cote because she exercised rights under these federal and state laws.  However, with Ms. Cote's consent, the Court grants the motion for summary judgment as to the interference claim.

## I.    PROCEDURAL BACKGROUND

On September 3, 2014, Jessica Cote filed a complaint in this Court against T-Mobile USA, Inc. (T-Mobile), her former employer, alleging that T-Mobile violated the

Family Medical Leave Act (FMLA), 29 U.S.C. § 2617, and its state counterpart, the Maine Family Medical Leave Act (MFMLA), 26 M.R.S. §§ 843-848. *Compl.* (ECF No. 1). On November 13, 2014, T-Mobile answered the Complaint. *Def.'s Answer* (ECF No. 8). On July 17, 2015, T-Mobile filed a motion for summary judgment and a statement of material facts. *Def.'s Mot for Summ. J.* (ECF No. 16); *Def.'s Statement of Material Facts* (ECF No. 17) (DSMF). On August 17, 2015, Ms. Cote filed a response to T-Mobile's motion, a response to its statement of material facts, and her own statement of material facts. *Pl.'s Opp'n to Def.'s Mot. for Summ. J.* (ECF No. 21) (*Pl.'s Opp'n*); *Pl.'s Resp. to Def.'s Statement of Material Facts and Pl.'s Statement of Additional Material Facts* (ECF No. 20) (PRDSMF; PSAMF). On September 3, 2015, T-Mobile filed a reply memorandum, a reply to Ms. Cote's statement of additional facts, and a statement of additional facts. *Def.'s Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J.* (ECF No. 24) (*Def.'s Reply*); *Def.'s Resp. to Pl.'s Statement of Additional Material Facts* (ECF No. 25) (DRPSAMF); *Reply Statement of Additional Material Facts* (ECF No. 25) (DRSAMF).[1] On September 14, 2015, Ms. Cote responded to T-

---

[1]     On September 3, 2015, with its response to the Plaintiff's statement of additional material fact, T-Mobile filed a reply statement of additional material facts. *See* DRSAMF ¶¶ 127-28. On September 14, 2015, Ms. Cote responded to these two additional paragraphs. PRDRSAMF ¶¶ 127-28.

        The Local Rules do not allow this additional filing. *See* D. ME. LOC. R. 56(b)-(d). The Local Rules provide for a movant's statement of material facts, *id.* R. 56(b), a response by the nonmovant and a set of additional material facts from the nonmovant, *id.* R. 56(c), and a reply by the movant to the nonmovant's additional facts. *Id.* R. 56(d). On the principle that enough is enough, the Rules do not allow the movant to add facts in the movant's response to the nonmovant's facts.

        If the movant wished the Court to consider these additional facts, it should have filed a motion seeking permission to do so. Here, however, as there are only two additional facts and as the nonmovant has admitted both of them, the Court included them in its recitation of facts despite the unauthorized additional filing.

Mobile's additional material facts. *Pl., Jessica Cote's Resp. to Def.'s Reply Statement of Additional Material Facts* (ECF No. 26) (PRDRSAMF).

## II.   THE COMPLAINT

Ms. Cote's Complaint contains three counts: (1) Count One—a claim that T-Mobile interfered with her right to use FMLA qualified leave and terminated her as a result of her use of FMLA qualified leave, an asserted violation of 29 U.S.C. § 2617;[2] (2) Count Two—a claim that T-Mobile retaliated against her because she exercised her FMLA rights, an asserted violation of 29 U.S.C. § 2617; and (3) Count Three—a claim that T-Mobile retaliated and discriminated against her for her exercise of rights under the MFMLA, an asserted violation of 26 M.R.S. §§ 843-48. *Compl.* at 4-6.

## III.   SUMMARY JUDGMENT FACTS[3]

### A.   General Background

T-Mobile operates a call center in Oakland, Maine which employs approximately 400 people. DSMF ¶ 1; PRDSMF ¶ 1. Inside the call center, customer service representatives (CSRs) are organized into teams. DSMF ¶ 2; PRDSMF ¶ 2. Each team has between two and fifteen CSRs. DSMF ¶ 3; PRDSMF ¶ 3. A "Coach" is a supervisor who supervises a team. DSMF ¶ 4; PRDSMF ¶ 4. Each team also has a "Senior Rep" who is responsible for taking escalated calls, assisting the Coach, and handling some administrative tasks; the CSRs do not report to the Senior Rep. DSMF

---

[2]     In her response, Ms. Cote conceded that upon completion of discovery, her claim is "one for retaliation and not interference." *Pl.'s Opp'n* at 2 n.2. Accordingly, the Court will dismiss Count One, the interference count.

[3]     In keeping with "the conventional summary judgment praxis," the Court recounts the facts in the light most favorable to the nonmovant's case theories consistent with record support. *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 17 (1st Cir. 2002).

¶ 5; PRDSMF ¶ 5.  Approximately six teams are organized into a group which is led by a team manager.  DSMF ¶ 6; PRDSMF ¶ 6.

T-Mobile hired Jessica Cote as a CSR in 2005.  DSMF ¶ 7; PRDSMF ¶ 7.  In 2005, the CSR's job consisted mostly of answering customers' questions about their phones or their service.  DSMF ¶ 8; PRDSMF ¶ 8.  In 2011, the role of the CSR was changed to include a sales component.  DSMF ¶ 9; PRDSMF ¶ 9.  T-Mobile provided extensive sales training to its CSRs when it added a sales component to CSRs' jobs during 2011.  PSAMF ¶ 83; DRPSAMF ¶ 83.  On each call, a CSR was required first to answer the customer's question or solve the problem, and after dealing with the issue which generated the customer's call, CSRs were trained to look at a caller's account to see if there were any enhancements that might improve that customer's experience with service.  DSMF ¶ 10; PRDSMF ¶ 10.

Along with a sales expectation, T-Mobile tracked metrics relevant to the performance of CSRs.  DSMF ¶ 11; PRDSMF ¶ 11.  Those metrics tracked sales-per-productive-hour (SPPH), the call resolution time (CRT), the frequency with which a customer had to call back with the same problem (iOCR), and feedback from the customer after the call.  DSMF ¶ 12; PRDSMF ¶ 12.  Each metric is averaged per productive hour or per call; for example, the SPPH metric divides the total sales a CSR accrued while being on the phone with customers by the total number of hours that the CSR was on the phone.  DSMF ¶ 13; PRDSMF ¶ 13.  Just as CSRs are responsible for their own metrics, Coaches are responsible for their teams' collective scores.  DSMF ¶ 14; PRDSMF ¶ 14.  Coaches are not evaluated on a raw sales

4

number; rather, the SPPH for each of their CSRs is averaged so that the metrics from a team with fifteen CSRs would be comparable to the metrics from a team with four CSRs. DSMF ¶ 15; PRDSMF ¶ 15. Because the metrics are averaged over a working hour, having CSRs on leave does not affect any metric, including sales. DSMF ¶ 16; PRDSMF ¶ 16. "CEO" is an acronym within T-Mobile for Customer, Employee and Owners. PSAMF ¶ 104; DRPSAMF ¶ 104.

CSRs work in their teams for six months after which the call center is realigned and the CSRs are assigned to a different schedule, a different team, usually with a new Team Manager, Coach, and Senior Rep. DSMF ¶ 17; PRDSMF ¶ 17. When an employee is absent, the calls that they would have taken are allocated across the thousands of CSRs working in any of the multiple call centers located across the country. DSMF ¶ 18; PRDSMF ¶ 18. A CSR's absence means fewer escalated calls that a Coach must take and fewer "coachings" that a Coach must complete. DSMF ¶ 19; PRDSMF ¶ 19. In some cases, an underperforming CSR's absence can help a team's metrics by raising the average. DSMF ¶ 20; PRDSMF ¶ 20.

### B.    Jessica Cote, T-Mobile Employment and Medical Leave

After beginning employment in 2005, Ms. Cote first took leave from August 7, 2006 through October 4, 2006; she then took leave from February 19, 2007 through March 26, 2007, from April 30, 2007 through July 2, 2007, from April 7, 2008 through May 17, 2008, from April 21, 2009 through November 23, 2009, and from November 15, 2010 through May 25, 2011; Ms. Cote requested and was granted intermittent leave from November 30, 2011 through September 20, 2012. DSMF ¶ 21; PRDSMF

5

¶ 21.   T-Mobile issued Ms. Cote discipline related to her attendance, but that discipline was not related to any FLMA protected absences.  DSMF ¶ 22; PRDSMF ¶ 22.  Mr. Cote's most recent disciplinary action concerning her attendance was given on April 20, 2007, five years before she was terminated.  DSMF ¶ 23; PRDSMF ¶ 23. In the last five years before her termination, Ms. Cote's absences were excused through the use of various leave entitlements, including the FMLA.  DSMF ¶ 24; PRDMSF ¶ 24.  When her FLMA benefits were exhausted, T-Mobile granted Ms. Cote additional leave.  DSMF ¶ 25; PRDSMF ¶ 25.

When T-Mobile employees entitled to intermittent leave need to miss work, they call their Coach to report their absences.  DSMF ¶ 26; PRDSMF ¶ 26.  After the Coach receives the call from the employee, the Coach then reviews the employee's leave entitlement and asks the Resource Planning Department at T-Mobile to code the absence as approved leave in the company records.  DSMF ¶ 27; PRDSMF ¶ 27. Time coded as approved FMLA leave is not counted as an absence for the purpose of measuring an employee's attendance record.  DSMF ¶ 28; PRDSMF ¶ 28.  After contacting the Resource Planning Department to report the absence of the CSR, the Coach then checks to see if the employee had previously scheduled any work for himself or herself (a "follow-up") that needed to be completed that day.  DSMF ¶ 29; PRDSMF ¶ 29.  Pursuant to Ms. Cote's FMLA leave agreement with T-Mobile, she could miss up to three days per month for any absence due to her medical conditions. PSAMF ¶¶ 94, 119; DRPSAMF ¶¶ 94, 119.

Ms. Cote took an extended medical leave from November 15, 2010 to May 25, 2011.  DSMF ¶ 30; PRDSMF ¶ 30.  When she returned to work, she was informed about the new job requirements for CSRs, including the sales expectation.  DSMF ¶ 31; PRDSMF ¶ 31.  T-Mobile then provided Ms. Cote with several hours of training on how to meet her new objectives.  DSMF ¶ 32; PRDSMF ¶ 32.

### C.    Jessica Cote and Performance Problems at T-Mobile

Coaches at T-Mobile constantly listened in to calls made by their CSRs to monitor performance.[4]  PSAMF ¶ 118; DRPSAMF ¶ 118.

In February 2012, before she was realigned off his team, Ms. Cote's Coach, Ward Kortleven, issued her a formal reminder, which is a second-level form of corrective discipline.  DSMF ¶ 33; PRDSMF ¶ 33.  The formal reminder stated that Ms. Cote had failed to hit any of her metrics, especially SSPH and CRT.  DSMF ¶ 34; PRDSMF ¶ 34.  The formal reminder did not mention Ms. Cote's attendance and Ms. Cote cannot recall any conversations with Mr. Kortleven about her attendance or leave.  DSMF ¶ 35; PRDSMF ¶ 35.

In February 2012, Ms. Cote also reviewed these metrics and the formal reminder with her new Coach, Greg Forney.  DSMF ¶ 36; PRDSMF ¶ 36.  In a group meeting with all of the CSRs, Mr. Forney discussed the need for CSRs to be present, but never discussed any specific attendance issues with Ms. Cote.  DSMF ¶ 37;

---

[4]      Although T-Mobile made a qualified response to Plaintiff's paragraph 118, the qualification went to the Coaches' credit review process, not listening in on CSRs' phone calls.  DRPSAMF ¶ 118. The Court included this portion of Plaintiff's paragraph 118 as drafted.

PRDSMF ¶ 37.  In April 2012, Ms. Cote's metrics began to improve and her formal reminder status expired in or about May 2012.  DSMF ¶ 38; PRDSMF ¶ 38.

In coaching sessions, Mr. Forney noted that Ms. Cote attributed the improvement in her performance to "scripting," a training tool where a CSR is provided an actual script that helps him or her facilitate a discussion with the customer; she also attributed the improvement to "nesting" with other CSRs to learn their techniques.  DSMF ¶ 39; PRDSMF ¶ 39.  Mr. Forney's coaching notes that documented these coaching sessions with Ms. Cote do not discuss offering free services or discounts to customers as a way of increasing sales.  DSMF ¶ 40; PRDSMF ¶ 40.

### D.    T-Mobile and Courtesy Credits

Under T-Mobile policy, a Coach may grant a CSR limited discretion to give a courtesy credit, up to a certain amount, when a long-term customer has been inconvenienced by T-Mobile.[5]  DSMF ¶ 41; PRDSMF ¶ 41.  The policy makes clear that courtesy credits should only be used as a last resort and that courtesy credits should never be used to make a sale.  DSMF ¶ 42; PRDSMF ¶ 42.  When a CSR gives a courtesy credit, he or she is supposed to code that credit under "GDWILL" in the system T-Mobile uses to track such discounts.  DSMF ¶ 43; PRDSMF ¶ 43.  If a CSR gives a credit within their limit, they do not need prior approval from their Coaches

---

[5]    Ms. Cote qualified her response to T-Mobile's paragraph 41, saying that she agrees that T-Mobile grants a CSR limited discretion to give a courtesy credit up to a certain amount, when a long-term customer had been inconvenienced by T-Mobile, but points out that the policy contains no definition of the terms "convenient" or "long-term," and provides no guidance for the Coach's and CSRs on how to make such a determination.  PRDSMF ¶ 41.  Ms. Cote's qualified response violates Local Rule 56(c), which requires that the nonmovant "shall support each denial or qualification by a record citation as required by this rule."  D. ME. LOC. R. 56(c).  The Court has not considered the qualification.

or Senior Reps.  DSMF ¶ 44; PRDSMF ¶ 44.  In 2012, the Coaches and Seniors Reps might not even have known that a CSR had issued a credit within his or her limit because they were not provided with reports listing the credits given by each of their CSRs.  DSMF ¶ 45; PRDSMF ¶ 45.  If a Coach wanted to see the credits issued by a specific CSR, he or she would have to go into the system to pull a special report.  DSMF ¶ 46; PRDSMF ¶ 46.  Nevertheless, the Coaches periodically reviewed credits and adjustments made by CSRs.[6]  PSAMF ¶ 118; DRPSAMF ¶ 118.

In late 2011 or early 2012, T-Mobile incentivized sales by offering bonuses to CSRs who met or exceeded their sales targets.  DSMF ¶ 47; PRDSMF ¶ 47.  T-Mobile also changed a policy to allow CSRs to keep the credit for their sales, even if the customers called back and changed their minds.  DSMF ¶ 48; PRDSMF ¶ 48.  After the change in policy, T-Mobile noticed that certain CSRs improperly added features to an account without the customer's consent or offered the customer additional services for free.  DSMF ¶ 49; PRDSMF ¶ 49.  In order to give the customer free services, the CSR would add the services, issue a credit for the amount of the services, and then enter in a reminder to cancel the service before the end of the billing cycle.  DSMF ¶ 50; PRDSMF ¶ 50.  Oakland Call Center employees labeled the activity

---

[6]    A portion of Ms. Cote's paragraph 118 read: "Coaches at T-Mobile . . . periodically review credits and adjustments made by CSRs."  PSAMF ¶ 118; DRPSAMF ¶ 118.  T-Mobile qualified its response to this paragraph by noting that "[a]lthough Coaches had the ability to review credits and adjustments made by CSRs, they were not provided with reports listing the credits given by each CSR. If a Coach wanted to see the credits issued by a specific CSR, he or she needed to go into the system to pull a special report."  DRPSAMF ¶ 118.  T-Mobile's qualification has been addressed by its paragraphs 45 and 46, which Ms. Cote has admitted.  DSMF ¶¶ 45-46; PRDSMF ¶¶ 45-46.  T-Mobile's qualification does not address whether the Coaches do, in fact, periodically review the credits and adjustments made by the CSRs and the Court has included this portion of Plaintiff's paragraph 118.

"slamming" an account or MRC (monthly recurring charge) Fraud.   DSMF ¶ 51;

PRDSMF ¶ 51.

During the summer of 2012, CSRs were held to a metric, or rating system, that

heavily weighed sales.  PSAMF ¶ 84; DRPSAMF ¶ 84.  The reason T-Mobile added

sales to the CSRs job responsibilities, and as a metric, was to gain revenue.  PSAMF

¶ 85; DRPSAMF ¶ 85.  Johnna Hatt of T-Mobile testified that T-Mobile was losing

revenue in 2012.[7]  PSAMF ¶ 86; DRPSAMF ¶ 86.  In 2012, T-Mobile was advertising

and selling "unlimited data service" to its customers.  PSAMF ¶ 87; DRPSAMF ¶ 87.

T-Mobile customers were sold a particular data package of either a gigabyte, two

gigabytes, or five gigabytes.  PSAMF ¶ 88; DRPSAMF ¶ 88.  When a customer reached

a certain data threshold, T-Mobile slowed down the customer's data speeds to a dial-

up speed.[8]  PSAMF ¶ 89; DRPSAMF ¶ 89.  Slowing down a customer's data speed to

---

[7]     T-Mobile made a qualified response to Ms. Cote's paragraph 86 on the ground that Ms. Hatt
testified that it was losing revenue due to slamming in 2012.  DRPSAMF ¶ 86.  The Court reviewed
the relevant portion of Ms. Hatt's deposition; it reads:

>   Q. Would you ever give them their speeds back and not charge them?
>   A. No.  That would be considered slamming an account.
>   Q. Was that a prohibited practice at T-Mobile?
>   A. Yes, because we were losing revenue at that point.
>   Q. In 2012?
>   A. Yes.

*Pl.'s Opp'n* Attach. 1 *Dep. of Johnna Hatt*, 18:9-15 (ECF No. 20) (*Hatt Dep.*).  Contrary to T-Mobile's
qualified response, Ms. Hatt testified that slamming was a prohibited practice at T-Mobile, not that
T-Mobile was losing revenue due to slamming.
        T-Mobile also qualified its response because as T-Mobile's Rule 30(b)(6) deponent, Ms. Hatt
was able to testify only about whether the Oakland Call Center was losing money, not whether T-
Mobile as a whole was losing money.  DRPSAMF ¶ 86.  The cited portion of Ms. Hatt's testimony,
however, is ambiguous on this point and the Court is compelled to view the testimony in the light most
favorable to Ms. Cote. The Court has therefore included her paragraph 86 as written, but it has also
included that Ms. Hatt was the one who testified that T-Mobile was losing revenue in 2012.

[8]     T-Mobile made a qualified response to Ms. Cote's paragraph 89, explaining that T-Mobile
customers purchased a particular amount of data for their data plans and when the customers used
up the amount of data they had purchased, the speed of the customers' Internet connections would

the dial-up speed created a slow connection and "not [] a very good experience for the customer." PSAMF ¶ 90; DRPSAMF ¶ 90. T-Mobile used the term "throttling" to describe the tactic of slowing down a customer's data speed to dial up speed and it led to many customers calling T-Mobile's CSRs thinking that their cellphones were broken. PSAMF ¶ 91; DRPSAMF ¶ 91. CSRs were told that when a customer called the company after being "throttled," the CSR should try and sell them a larger data plan. PSAMF ¶ 92; DRPSAMF ¶ 92. T-Mobile considered selling a customer a more expensive data plan after they had been throttled an "easy upsell." PSAMF ¶ 93; DRPSAMF ¶ 93.

### E.   Jessica Cote and Courtesy Credits

In August 2012, the Oakland Call Center was realigned and Ms. Cote was assigned to a new team with Sharon Mumley as her Coach and Ryan Bowman as her Team Manager. DSMF ¶ 52; PRDSMF ¶ 52. Ms. Mumley never had any conversation with Ms. Cote about her attendance and Ms. Cote does not recall having any conversation with Ms. Mumley about her FMLA leave. DSMF ¶ 53; PRDSMF ¶ 53.

Just before the realignment, Ms. Mumley discovered that another CSR, K.W., was issuing an inappropriate number of credits in an effort to increase her sales. DSMF ¶ 54; PRDSMF ¶ 54. Ms. Mumley noticed the credits when she was processing

---

slow down because the customers did not have any data remaining. DRPSAMF ¶ 89. At that point, T-Mobile explained, the customers could purchase more data from T-Mobile to immediately restore the Internet speed or wait until the beginning of the next billing cycle when the customers would have available the full amount of purchased data. *Id.* The Court accepts T-Mobile's explanation for the slow-down of customers' data, but it is unclear why the explanation is relevant to the issues before the Court and the Court has not included the T-Mobile explanation.

K.W.'s follow-ups.   DSMF ¶ 55; PRDSMF ¶ 55.   T-Mobile terminated K.W. from employment for giving improper credits.   DSMF ¶ 56; PRDSMF ¶ 56.

### F.     T-Mobile's Firing of Jessica Cote

Ms. Cote had been out on intermittent FMLA leave twice during the week leading up to her termination.  PSAMF ¶ 124; DRPSAMF ¶ 124.  On August 29, 2012, Ms. Cote called Ms. Mumley to inform her that she would be taking her intermittent leave and that she would not be in that day.  DSMF ¶ 57; PRDSMF ¶ 57.  Ms. Mumley logged the leave and reported the absence according to T-Mobile procedure.  DSMF ¶ 58; PRDSMF ¶ 58.  Later that day, Ms. Mumley checked to see if Ms. Cote had any follow-ups that needed to be performed that day.  DSMF ¶ 59; PRDSMF ¶ 59.  When she pulled Ms. Cote's follow-ups, Ms. Mumley noticed that the number of credits to be entered by Ms. Cote raised a red flag.[9]  DSMF ¶ 60; PRDSMF ¶ 60.  Ms. Mumley then pulled a report that showed a sample of calls where Ms. Cote had given credits, and listened to the sampled calls where Ms. Cote had given an adjustment.[10]  DSMF ¶¶ 61-62; PRDSMF ¶¶ 61-62.  Ms. Mumley pulled another report showing Ms. Cote's total adjustments issued since February 2012 and found that she had issued more than $30,000 in credits.  DSMF ¶ 64; PRDSMF ¶ 64.

---

[9]     Ms. Cote made a qualified response to T-Mobile's paragraph 60, saying that it was Ms. Mumley's "impression" that Ms. Cote's credits were unusual.  PRDSMF ¶ 60.  The Court reviewed the cited portion of Ms. Mumley's deposition and found that the term she used was "raised a red flag."  DSMF ¶ 60.  The Court tracked Ms. Mumley's actual language and it overrules the qualified response.
[10]     T-Mobile's paragraph 63 states: "Ms. Mumley found that out of the 33 calls, 23 customers were given adjustments in violation of the courtesy credit policy."  DSMF ¶ 63.  In support of this assertion, T-Mobile cites Exhibit 1 of the Mumley deposition.  *Id.*  The Court reviewed this exhibit and found no decipherable support for this statement.  Ms. Cote denied the paragraph and the Court declines to accept it.

Ms. Mumley collected the information and reported to her Team Manager, Ryan Bowman. DSMF ¶ 65; PRDSMF ¶ 65. Because Mr. Bowman managed six separate teams at that time, he did not know Ms. Cote nor did he know that she was entitled to take intermittent FMLA leave. DSMF ¶ 66; PRDSMF ¶ 66. Mr. Bowman reviewed the information gathered by Ms. Mumley and listened to the recordings of the calls himself. DSMF ¶ 67; PRDSMF ¶ 67. Mr. Bowman was very concerned about the credits issued by Ms. Cote because she was issuing approximately $5,000 in credits per month; he would consider credits in the range of $400 to $600 per month to be high. DSMF ¶ 68; PRDSMF ¶ 68. Based on his review of the information, Mr. Bowman was concerned that Ms. Cote was able to increase her sales, and therefore her bonus, by adding features to customer accounts without charging the customer for it, and because she was crediting the accounts, T-Mobile was not making any money on the features she was adding.[11] DSMF ¶ 69; PRDSMF ¶ 69. Mr. Bowman concluded that Ms. Cote's conduct amounted to an offense against T-Mobile which warranted her termination. DSMF ¶ 70; PRDSMF ¶ 70.

On September 1, 2012, Mr. Bowman called Ms. Cote to join Ms. Mumley and himself in a conference room, accused Ms. Cote of fraudulent activity, and asked Ms. Cote for an explanation of the credits. DSMF ¶ 71; PRDSMF ¶ 71; PSAMF ¶ 95; DRPSAMF ¶ 95. Mr. Bowman explained to Ms. Cote that he considered her conduct

---

[11]      Ms. Cote objected to this paragraph on the ground that Mr. Bowman's statements were self-serving and there was no evidence in support of his conclusions. PRDSMF ¶ 69. Although Mr. Bowman's statements may have supported T-Mobile's position, this does not make them inadmissible. Mr. Bowman explained that by increasing sales by giving T-Mobile credits and receiving personal bonuses based on her increased sales, Ms. Cote was making money at T-Mobile's expense. *See* DSMF Attach. 6 *Dep. of Ryan Bowman*, 31:2-13 (ECF No. 17) (*Bowman Dep.*). In the Court's view, Mr. Bowman's testimony is inescapably logical and the Court rejects Ms. Cote's denial.

to be "slamming" or "MRC fraud" because T-Mobile did not realize revenue from the sale.  DRSAMF ¶ 128; PRDRSAMF ¶ 128.  Ms. Cote explained that she did offer the credits in order to get customers to purchase extra features but that "everybody was doing it" and she was told by her Senior Rep Daryl Wright and her Coach Greg Forney that it was permissible to do so.[12]  DSMF ¶ 72; PRDSMF ¶ 72.  In fact, she told Mr. Bowman and Ms. Mumley that she had spoken to Daryl Wright, her prior Senior Representative, and Greg Forney, her prior Coach, and that they had approved the credits she was issuing.  PSAMF ¶ 114; DRPSAMF ¶ 114.

Based on her discussions with co-employees at work and in the smoke shack, and her reviews of credits issued by other CSRs while she was doing follow-ups on customer accounts, Ms. Cote believed that all the CSRs were giving credits; she could not, however, recall the specific names of any CSRs who were doing so.[13]  DSMF ¶ 73; PRDSMF ¶ 73.  Mr. Bowman sent Ms. Cote home for the day with pay.  DSMF ¶ 74; PRDSMF ¶ 74.  Mr. Bowman then made the decision to terminate Ms. Cote's employment.  DSMF ¶ 75; PRDSMF ¶ 75.

---

[12]    T-Mobile's paragraph 72 included Mr. Wright, not Mr. Forney.  DSMF ¶ 72.  Ms. Cote interposed a qualified response on the ground that she testified that her Coach Greg Forney also told her the same thing.  PRDSMF ¶ 72.  The Court reviewed the cited portion of Ms. Cote's deposition testimony and agrees with her.  As the Court is required to view the facts in the light most favorable to Ms. Cote, the Court included this additional fact.

[13]    T-Mobile's paragraph 73 reads:  "In her deposition, beyond saying "everybody was doing it" Ms. Cote could not name a single person who was giving credits in order to induce customers to purchase extra features."  DSMF ¶ 73.  Ms. Cote interposed a qualified response, indicating that T-Mobile's paragraph mischaracterized her testimony.  PRDSMF ¶ 73.  Citing portions of her deposition, Ms. Cote stated that she believed that everybody was giving credits based on her general discussions with others in her area and in the smoke shack, and based on her reviews of credits issued by other CSRs while she was doing follow-ups on customer accounts.  *Id.*  The Court reviewed the cited portions of Ms. Cote's testimony by both T-Mobile and Ms. Cote and has amended the paragraph to reflect the Court's obligation to view the facts in the light most favorable to the nonmovant.

After he made his decision, Mr. Bowman brought the reports to Human Resources who approved the decision.  DSMF ¶ 76; PRDSMF ¶ 76.  Mr. Bowman did not consult Daryl Wright or Greg Forney before making the decision to terminate Ms. Cote's employment.  DSMF ¶ 77; PRDSMF ¶ 77.  Ms. Mumley listened to all of the calls that were the basis for her investigation and went over her findings from these calls with Ryan Bowman before Mr. Bowman made his decision to terminate Ms. Cote.  PSAMF ¶ 126; DRPSAMF ¶ 126.  Ms. Mumley gave Mr. Bowman a verbal summary of her findings about Ms. Cote's calls.[14]  PSAMF ¶ 117; DRPSAMF ¶ 117.  Mr. Bowman testified that the recorded phone calls were not important to his decision to terminate Ms. Cote's employment because he concluded that the improper activity in which she was engaging was taking place with credits and the customer would not have been aware that the credits were not authorized.[15]  DSMF ¶ 79; PRDSMF ¶ 79.  Mr. Bowman also testified that the evidence was sufficient to document the reasons for his decision to terminate Ms. Cote.[16]  DSMF ¶ 80; PRDSMF ¶ 80.  Mr. Bowman informed Sharon Mumley that he followed up with Daryl Wright regarding Ms. Cote's statement that Mr. Wright encouraged the credits that Ms. Cote was giving.  PSAMF

---

[14]     Plaintiff's original paragraph 117 read: "Sharon Mumley stated at her deposition that she only gave Mr. Bowman a verbal summary of the calls."  PSAMF ¶ 117.  T-Mobile denied the paragraph, stating that Ms. Mumley testified that she gave Mr. Bowman a verbal summary of her findings and that she did not testify that she had given Mr. Bowman only a verbal summary of her findings. DRPSAMF ¶ 117.  The Court reviewed the cited portion of Ms. Mumley's deposition and agrees that T-Mobile's characterization of her testimony is more accurate and has altered the paragraph accordingly.

[15]     Ms. Cote denied T-Mobile's paragraph 79 on the ground that Mr. Bowman testified to this statement, not that it was true.  PRDSMF ¶ 79.  The Court altered paragraph 79 to respond to Ms. Cote's concern.

[16]     Ms. Cote qualified her response to T-Mobile's paragraph 80 on the ground that Mr. Bowman testified to this statement, not that it was true.  PRDSMF ¶ 80.  The Court has altered paragraph 80 to respond to Ms. Cote's concern.

¶ 115; DRPSAMF ¶ 115.  Mr. Bowman based his decision to terminate Ms. Cote after reviewing the information provided to him by Sharon Mumley and listening to the phone calls in which Ms. Mumley based her assertion that Ms. Cote was engaging in fraudulent activity.  PSAMF ¶ 125; DRPSAMF ¶ 125.

At the time and unless they are otherwise saved, T-Mobile discarded recorded phone calls after 90 days.  DSMF ¶ 81; PRDSMF ¶ 81.  Recorded phone calls are generally only saved when an employee is being disciplined for his or her rude behavior toward a customer; they are not typically saved in cases where the CSR is terminated for issuing improper credits.  DSMF ¶ 82; PRDSMF ¶ 82.

Karen Estes verbally signed-off on Mr. Bowman's decision to terminate Ms. Cote's employment.  DRSAMF ¶ 127; PRDRSAMF ¶ 127.  On or about September 2, 2012, Ryan Bowman and Karen Estes called Ms. Cote and told her she was fired. PSAMF ¶ 96; DRPSAMF ¶ 96.

Ms. Mumley made fraud allegations against another T-Mobile employee who was on her team, K.W., when K.W. was on leave for a medical illness. [17]  PSAFM ¶ 106; DRPSAMF ¶ 106.

## G.    The Maine Department of Labor Proceeding

---

[17]     T-Mobile's paragraph 78 reads: "Ms. Cote does not know of anyone else at T-Mobile being subject to any kind of adverse treatment by Ms. Mumley or any other supervisor because of their FMLA leave."  DSMF ¶ 78.  Ms. Cote denied this paragraph, stating that just before becoming Ms. Cote's Coach, Ms. Mumley caused the termination of K.W., another employee, under circumstances similar to hers.  PRDSMF ¶ 78.  Ms. Cote's denial is further explained in her paragraph 106.  PSAMF ¶ 106.  T-Mobile made a qualified response to Ms. Cote's paragraph 106 on the ground that "Ms. Mumley testified that K.W. had been out ill, not that K.W. was 'on leave for a medical illness.'" DRPSAMF ¶ 106.  Viewing this dispute in the light most favorable to Ms. Cote, the Court included Plaintiff's paragraph 106 and excluded T-Mobile's paragraph 78.

On or about September 7, 2012, the Maine Department of Labor (MDOL) requested information from T-Mobile regarding Jessica Cote's termination because she applied for unemployment benefits.   PSAMF ¶ 97; DRPSAMF ¶ 97.   On September 14, 2012, TALX, a company that processes unemployment claims for T-Mobile, wrote the MDOL and stated that: "It was determined that the claimant was adding features to customers['] accounts without their permission . . . [w]hen employees add features to customers['] accounts without their permission it increases the cost our customers pay in their monthly bill.   This builds mistrust with our customers and the[] company and customers don't view the employer's actions as ethical."   PSAMF ¶ 98; DRPSAMF ¶ 98.   T-Mobile told the MDOL that this was "unacceptable and improper conduct" and requested relief from having to pay unemployment benefits.   PSAMF ¶ 99; DRPSAMF ¶ 99.   Karen Estey supplied the information that TALX used to respond to the MDOL's inquiry.   PSAMF ¶ 100; DRPSAMF ¶ 100.

On October 5, 2012, Karen Estes drafted a letter to Jessica Cote in response to her request for the reason her employment was terminated; T-Mobile's legal team reviewed the letter before it was sent to Ms. Cote.   PSAMF ¶ 101; DRPSAMF ¶ 101.   Ms. Estes explained that the discrepancies between her initial report to MDOL and her October 5, 2012 letter to Ms. Cote were likely due to a "misspeak" based on information that she had done in the few days prior to her deposition.   PSAMF ¶ 102; DRPSAMF ¶ 102.   Ms. Mumley stated that based on her investigation, Ms. Cote was

not adding features to customer accounts without the customer's permission.  PSAMF ¶ 103; DRPSAMF ¶ 103.

Greg Forney stated that the giving of excessive credits is something on which he would definitely have coached Ms. Cote.  PSAMF ¶ 122; DRPSAMF ¶ 122.  Ms. Cote's coaching records are devoid of any indication that Mr. Forney ever coached her about excessive credits.  PSAMF ¶ 123; DRPSAMF ¶ 123.  Based on Ms. Cote's account of one phone call that Ryan Bowman and Sharon Mumley played for her during her termination meeting, her prior Coach, Greg Forney, did not think the "credit" was inappropriate and only had an issue with the way she coded the credit in T-Mobile's system.[18]  PSAMF ¶ 105; DRPSAMF ¶ 105.

---

[18]     T-Mobile denied this paragraph on the ground that it contains inadmissible opinion evidence and is speculative.  DRPSAMF ¶ 105.  As the Court will explain, for purposes of the motion for summary judgment only, the Court overrules T-Mobile's objection and it also overrules Ms. Cote's similarly based objection regarding the contents of the disputed telephone calls with customers.

To set the stage, when Mr. Bowman and Ms. Mumley confronted Ms. Cote with alleged misconduct, Ms. Cote responded in part that she was doing what her prior Coach, Greg Forney (and Daryl Wright) had told her to do.  DSMF ¶ 72; PRDSMF ¶ 72.  This paragraph states that during the termination conference, Mr. Bowman and Ms. Mumley played a recording of a customer call to Ms. Cote, presumably as an example of her misconduct.  In response, Ms. Cote contends when Mr. Forney was asked to assume the contents of the telephone call, he expressed the view that Ms. Cote had not wrongly extended the credit but may have wrongly coded it.

In addition, T-Mobile claims that it rightfully fired Ms. Cote based on her inappropriate extension of credit to customers as revealed by the content of numerous phone calls.

The evidentiary problem is that T-Mobile deleted the contents of all the phone calls, raising the question as to whether the contents of any of them would be admissible.  The admissibility of the contents of the telephone calls thus presents itself in two ways.  First, T-Mobile says that it was based on the contents of the telephone calls that it terminated Ms. Cote.  Second, Ms. Cote says that based on the contents of the telephone call that was played during her termination conference with Mr. Bowman and Ms. Mumley, Mr. Forney opined that she had been following his coaching instructions.

T-Mobile claims that despite its deletion, the contents of the phone calls are admissible to support the legitimacy of its termination of Ms. Cote, but it claims that Mr. Forney's opinion based on the content of one phone call is inadmissible.  Ms. Cote claims that the content of the phone calls is inadmissible, but the content of one phone call is admissible.

Assuming that the content of the phone calls is being offered for the truth of what was said, T-Mobile would likely be able to admit the content under Federal Rule of Evidence 801(d)(2)(A) as the statement of a party opponent.  FED. R. EVID. 801(d)(2)(A).  Assuming she testified that she was only following Mr. Forney and Mr. Wright's directives, Ms. Cote might be able to admit the content of the phone call in order to rebut an express or implied charge that she was fabricating their advice.  *See*

### H.   T-Mobile, Absenteeism and the FMLA

Greg Forney stated that when there are a number of people on FMLA, it makes it harder for the people who are on the team and come to work every day.[19] PSAMF ¶ 107; DRPSAMF ¶ 107.  Mr. Forney also made comments about the high number of employees on FMLA on his team.  PSAMF ¶ 108; DRPSAMF ¶ 108. Although she could not recall a specific employee discussing it, Ms. Cote said that employees at T-Mobile would talk about the high number of workers on FMLA and that it was always a problem.[20]  PSAMF ¶ 109; DRPSAMF ¶ 109.  Absenteeism is

---

FED. R. EVID. 801(d)(1)(B)(i).  The Court is not clear, however, that the contents of the phone calls are being admitted for their truth.  For example, whether the customer actually had the problem he or she was claiming is not at issue, nor is whether Ms. Cote was telling the truth when she told the customer she was giving him or her a credit. The contents of the phone call would be admitted to address whether Ms. Cote's handling of the call was consistent with T-Mobile procedure.

Additionally, Mr. Forney's opinion about whether Ms. Cote acted appropriately during the telephone call is, in this Court's view, admissible opinion evidence because it is based on his knowledge and training as a Coach at T-Mobile.  FED. R. EVID. 701 (rationally based on the witness's perception, helpful to clearly understanding the witness's testimony or to determining a fact in issue, and not based on scientific, technical, or other specialized knowledge within the scope of Rule 702).  The parties have presented facts that a Coach was required to occasionally review the recordings of telephone calls and, in fact, it was Ms. Mumley's review of Ms. Cote's calls that ultimately led to her termination. Thus, Mr. Forney's response to the contents of the telephone call fits well within permissible opinion testimony.

Finally, Mr. Forney is not being asked to speculate about the contents of the phone call.  Ms. Cote presumably recalls the contents since she participated in the conversation with the customer and heard it again during her termination meeting with Mr. Bowman and Ms. Mumley.  In giving his opinion about the contents of the telephone call, Mr. Forney is being asked to assume facts in evidence.

In their summary judgment memoranda, the parties did not address the admissibility issue, except by confident, conclusory assertions, and the evidentiary issues have not been adequately briefed from the Court's perspective.  Thus, for purposes of ruling on the motion for summary judgment, the Court has concluded that the contents of the phone calls, including the termination conference phone call, are admissible.  But, if this case goes to trial, the Court expects more thorough briefing before making a final ruling.

[19]    T-Mobile made a qualified response to Ms. Cote's paragraph 107 on the ground that the statement is based solely on Ms. Cote's testimony and that Mr. Forney denied having made the statement.  DRPSAMF ¶ 107.  As the Court is required to view the facts in the light most favorable to the nonmovant, the Court has accepted Ms. Cote's paragraph 107.

[20]    T-Mobile made a qualified response to Ms. Cote's paragraph 109 on the ground that she could not name a single employee who had made such a statement.  DRPSAMF ¶ 109.  The Court reviewed the cited portion of Ms. Cote's deposition transcript, concurs with T-Mobile that the qualifier is appropriate, and has so altered Ms. Cote's paragraph 109.

something that is always looked at by T-Mobile.  PSAMF ¶ 110; DRPSAMF ¶ 110.

When there are few employees to take phone calls, it can make it tough to do business

at T-Mobile.  PSAMF ¶ 111; DRPSAMF ¶ 111.  It was important enough to have CSRs

available to take calls that the Oakland facility would cut short coaching sessions

when there was a large volume of calls in the queue.  PSAMF ¶ 112; DRPSAMF ¶

112.  CSR absences create extra work for coaches who have to do the absent CSRs'

follow-ups, although Ms. Mumley testified that to do a follow-up on one absent CSR

would take her a couple of minutes.[21]  PSAMF ¶ 113; DRPSAMF ¶ 113.

Team managers have access to information regarding a particular employee's

FMLA leave.  PSAMF ¶ 120; DRPSAMF ¶ 120.  Ryan Bowman spoke to Karen Estes,

who knew about Ms. Cote's FMLA status, and Karen Estes was one of the three

people to approve Ms. Cote's termination.  PSAMF ¶ 121; DRPSAMF ¶ 121.

## IV.   THE PARTIES' POSITIONS

### A.   T-Mobile's Motion: Counts Two and Three—the Retaliation Claims

T-Mobile sets the stage for its argument by noting the distinction in the FMLA

between substantive rights and protections to employees for invoking those rights.

*Def.'s Mot.* at 9-10.  T-Mobile quotes the First Circuit as saying that "although an

employee who properly takes FMLA leave cannot be discharged for exercising a right

---

[21]      Ms. Cote's paragraph 113 stated: "CSR absences create extra work for coaches who have to do the absent CSRs['] follow-ups."  PSAMF ¶ 113.  Ms. Cote cited a portion of the deposition of Ms. Mumley.  *Id.* (citing PSAMF Attach. 4 *Dep. of Sharon Mumley*, 68:22-69:5 (ECF No. 20) (*Mumley Dep.*)).  T-Mobile made a qualified response pointing out that within the cited portion of Ms. Mumley's deposition, she stated that to do the work of an absent CSR would take a couple of minutes.  *Mumley Dep.* 69:3-5.  The Court has included T-Mobile's qualifying fact in paragraph 113.

provided by the statute, she nevertheless can be discharged for independent reasons." *Id.* at 10 (quoting *Henry v. United Bank*, 668 F.3d 50, 55 (1st Cir. 2012)).  T-Mobile then recites the applicable "shifting burdens" analysis for FMLA claims under *McDonnell Douglas.  Id.*

T-Mobile skips the first two steps in the *McDonnell Douglas* analysis and runs directly to whether Ms. Cote is able to satisfy her "ultimate burden."  *Id.* at 11.  T-Mobile says that Ms. Cote is unable to do so because "there is no causal connection between Ms. Cote's termination and Ms. Cote's use of FMLA leave."  *Id.*  T-Mobile says that it was Mr. Bowman who made the decision to terminate Ms. Cote and "Mr. Bowman did not know Ms. Cote personally and he had no knowledge or reason to know that Ms. Cote had been taking FMLA leave."  *Id.*

Anticipating Ms. Cote's response, T-Mobile disputes the applicability of the so-called "cat's paw" theory of liability.  *Id.* at 11-14.  T-Mobile acknowledges that an employee can still hold an employer responsible under a cat's paw theory if the decision-maker is unknowingly acting on behalf of an individual with discriminatory animus.  *Id.*  T-Mobile says that only three people within T-Mobile "could have known about Ms. Cote's FMLA status at the time of her termination: Daryl Wright, the Senior Rep on her team, Greg Forney, her Coach prior to the realignment, and Sharon Mumley, her Coach after realignment."  *Id.* at 12.  T-Mobile contends that there is no direct or indirect evidence that any of these individuals, especially evidence concerning Ms. Mumley, harbored a discriminatory animus against Ms. Cote for taking FMLA leave.  *Id.* at 12-14.

21

Finally, T-Mobile maintains that there is no evidence that T-Mobile's termination decision was pretextual. *Id.* at 14-17. T-Mobile contends that "the record is devoid of any evidence that any relevant person at T-Mobile had a negative opinion of Ms. Cote's use of FMLA leave or FMLA leave generally." *Id.* at 14. T-Mobile rejects the notion that the timing of Ms. Cote's termination would allow an inference of pretext or animus. *Id.* at 15. T-Mobile argues that even if Mr. Forney's comments and role in her supervision are taken as true, there is no evidence that Mr. Forney had anything to do with her termination or that Mr. Bowman, who did make the decision, knew anything about Mr. Forney's words or actions. *Id.* at 16-17.

## B.   Jessica Cote's Response

Jessica Cote sees it differently.

### 1.   Ms. Cote's Prima Facie Case

Following the *McDonnell Douglas* burden-shifting analysis, Ms. Cote turns first to whether she has stated a prima facie case of FMLA retaliation against T-Mobile. *Pl.'s Opp'n* at 5-7. Citing *Carrero-Ojeda v. Autoridad De Energia Electica*, 755 F.3d 711, 719 (1st Cir. 2014), Ms. Cote lists three elements she must prove to establish a prima facie case: (1) that she had availed herself of a protected FMLA right, (2) that she was adversely affected by an employment decision, and (3) that there was a causal connection between her protected conduct and the adverse employment action. *Id.* at 6. She notes that the task of establishing a prima case of unlawful retaliation is undemanding. *Id.* (citing *Daigle v. Stulc*, 794 F. Supp. 2d 194, 237 (D. Me. 2011)). Ms. Cote points out that T-Mobile had granted her intermittent

FMLA leave from November 30, 2011 through September 20, 2012, and on August 29, 2012, she called her Coach, Sharon Mumley, to inform Ms. Mumley that she would take intermittent leave that day and would not report to work. *Id.* (citing DSMF ¶¶ 21, 57). When she returned to her regular shift on September 1, 2012, she was called into the meeting with Mr. Bowman and Ms. Mumley and accused of fraud. *Id.* (citing DSMF ¶ 71, PSAMF ¶ 95). The next day, she was fired. *Id.* (citing DSMF ¶ 96). With this close temporal connection between her assertion of the FMLA right and her termination, she says she has sustained her burden of proving a prima facie case. *Id.* at 7.

### 2.    T-Mobile's Lawful Termination

Noting that once she established a prima facie case, T-Mobile then bears the burden of coming forward with evidence of "some legitimate, nondiscriminatory reason for the employee's termination." *Id.* (citing *Hodgens v. General Dynamics Corporation*, 144 F.3d 151, 160 (1st Cir. 1998)). Ms. Cote maintains that T-Mobile is unable to sustain this burden because it "deleted all evidence of the phone calls reviewed by Ryan Bowman and Sharon Mumley that were used in making the determination that Jessica Cote violated the company's Courtesy Credit Policy." *Id.* at 7-8.

Next, Ms. Cote points out that on or about September 7, 2012, after Ms. Cote applied for unemployment benefits, the MDOL requested information from T-Mobile about her termination. *Id.* at 8. Based on information supplied by Karen Estes, TALX informed MDOL on September 14, 2012 that T-Mobile terminated Ms. Cote's

employment because she had added features to customers' accounts without their permission, increasing the customers' bills and causing mistrust.  *Id.*  Three weeks later, on October 5, 2012, Ms. Estes wrote to Ms. Cote that the reason for her termination was her fraudulent application of credits to customer accounts.  *Id.*  At her later deposition, Ms. Estes characterized her first explanation as a "misspeak." *Id.* at 9.  Assuming the September 14, 2012 statement was in error, Ms. Cote presses the point that absent evidence of the contents of the actual calls, T-Mobile is unable to prove that she violated company policy.  *Id.*

Finally, Ms. Cote turns to T-Mobile's courtesy credit policy.  *Id.* at 9-12.  She acknowledges that T-Mobile policy allowed the use of a courtesy credit when a long-term customer had been inconvenienced by T-Mobile and that T-Mobile restricted the issuance of a courtesy credit only as a "last resort to retain loyalty when a customer has been inconvenienced."[22]   *Id.* at 9 (quoting DSMF ¶ 42).  Although T-Mobile claimed that Ms. Cote violated its Courtesy Credit policy by offering courtesy credits to numerous customers who (1) did not suffer any inconvenience, and (2) who had no reason to receive these credits, Ms. Cote disputes T-Mobile's assertion and maintains that she was issuing credits to inconvenienced, long-term customers who were upset about being throttled.  *Id.* at 10.  She notes that her former Coach Greg Forney did not think that phone call Mr. Bowman and Ms. Mumley played during Ms. Cote's termination meeting was inappropriate.  *Id.*

---

[22]    In her response, Ms. Cote quoted extensively from the T-Mobile guidelines.  *Pl.'s Opp'n* at 9-10 (citing DSMF paragraph 42).   The Court could not locate any of these quotations in the statements of material fact and has not considered them.

Ms. Cote observes that Mr. Bowman based his termination decision after reviewing information provided by Ms. Mumley and listening to the phone calls Ms. Mumley presented. *Id.* at 10-11. She reiterates that even though the content of the phone calls was "an integral part of Sharon Mumley's investigation, and Sharon Mumley's findings regarding those calls being an integral part of Ryan Bowman's decision to terminate [Ms. Cote], those calls were erased and cannot be replaced by T-Mobile." *Id.* at 11. She asserts that Ms. Mumley's recollection of the content of those calls is inadmissible hearsay and that T-Mobile "will not be able to prove what Karen Estes stated in her October 5, 2012 letter." *Id.*

### 3.   Pretext

Ms. Cote next contends that even if T-Mobile is able to carry its burden of production, "there is evidence in the record to create trial worthy issues as to whether T-Mobile's stated reason for terminating [Ms. Cote] is pretext and that the real reason for her termination was retaliation for her exercise of protected FMLA leave." *Id.* at 12. She describes the factors supporting her contention that there are material disputed facts on this issue that require jury resolution: (1) temporal proximity, (2) false, inaccurate or inconsistent statements regarding the reason for the termination, (3) a particular pattern of conduct, (4) comments in the workplace about the protected activity, and (5) other evidence undermining the truthfulness of the employer's basis for its action. *Id.* at 13-17. Turning to the last factor, Ms. Cote argues that there was a "surprising lack of investigation conducted by Ryan Bowman after he met with [Ms. Cote] to speak to her about the alleged misconduct. *Id.* at 17.

### 4.   Cat's Paw

Responding to T-Mobile's contention that Mr. Bowman did not know about Ms. Cote's FMLA status when he decided to terminate her, Ms. Cote argues that the "evidence in the record creates a disputed fact" on this issue.  *Id.* at 19.  She points to the fact that as a part of his investigation, Mr. Bowman spoke with individuals within T-Mobile who were familiar with Ms. Cote's FMLA status, including Ms. Estes, Ms. Mumley, and Mr. Wright.  *Id.*

### C.   T-Mobile's Reply

Turning first to Ms. Cote's assertion that there is evidence that Mr. Bowman knew about her FMLA status, T-Mobile says that Ms. Cote admitted that there is no direct evidence that Mr. Bowman actually knew this fact before he terminated her employment.  *Def.'s Reply* at 1-2 (citing DSMF ¶ 66).  Accordingly, T-Mobile says that Ms. Cote can survive summary judgment only if she can show that the cat's paw analysis applies.  *Id.* at 2.  T-Mobile argues that even if Ms. Cote could prove that Ms. Mumley displayed a discriminatory animus against her because she used FMLA benefits, Ms. Cote cannot meet the criteria for application of the cat's paw theory.  *Id.* (citing *Cariglia v. Hertz Equip. Rental Corp.*, 363 F.3d 77, 85-86 (1st Cir. 2004)).  T-Mobile reiterates its view that there is no evidence of pretext.  *Id.* at 5-6.  Finally, T-Mobile contends that it "has satisfied its burden of production by articulating a legitimate, non-discriminatory reason for the termination of Ms. Cote's employment, namely, that Mr. Bowman concluded that Ms. Cote was engaging in fraud by offering customers unauthorized billing credits."  *Id.* at 6-7.

26

## V.    SUMMARY JUDGMENT STANDARD

### A.    The General Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A fact is "material" if it "has the potential to change the outcome of the suit." *Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011) (quoting *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010)).  A dispute is "genuine" if "a reasonable jury could resolve the point in favor of the nonmoving party." *Id.* (quoting *McCarthy v. Nw. Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)).

"If the moving party has made a preliminary showing that there is no genuine issue of material fact, the nonmovant must 'produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue.'" *McCarthy v. City of Newburyport*, 252 Fed. App'x 328, 332 (1st Cir. 2007) (internal punctuation omitted) (quoting *Triangle Trading Co., Inc. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999)).  In other words, the nonmoving party must "present 'enough competent evidence' to enable a factfinder to decide in its favor on the disputed claims." *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman v. First Nat'l Bank of Bos.*, 985 F.2d 1113, 1116 (1st Cir. 1993)).

The Court then "views the facts and draws all reasonable inferences in favor of the nonmoving party." *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011) (citing *Fed. Ins. Co. v. Commerce Ins. Co.*, 597 F.3d 68, 70 (1st Cir.

2010)).  But the Court "afford[s] no evidentiary weight to 'conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative.'"  *Tropigas*, 637 F.3d at 56 (quoting *Rogan v. City of Boston*, 267 F.3d 24, 27 (1st Cir. 2001)); *accord Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 325 (1st Cir. 2009).

## B.    FMLA Cases:  The *McDonnell Douglas* Analysis

In *Hodgens v. General Dynamics Corporation*, 144 F.3d 151 (1st Cir. 1998), the First Circuit ruled that "when there is no direct evidence of discrimination, the *McDonnell Douglas*[23] burden-shifting framework applies to claims that an employee was discriminated against for availing himself of FMLA-protected rights."  *Id.* at 160. The *Hodgens* Court explained that *McDonnell Douglas* "allocates the burdens of production and persuasion in accordance with a three-step procedure."  *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802-04).  Under that framework, a plaintiff employee "must carry the initial burden of coming forward with sufficient evidence to establish a prima facie case of discrimination or retaliation."  *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802).  "If he does so, then the burden shifts to the employer 'to articulate some legitimate, nondiscriminatory reason for the employee's [termination],' sufficient to raise a genuine issue of fact as to whether it discriminated against the employee."  *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802).  The employer "must clearly set forth, through the introduction of admissible evidence, the reasons for the [employee's termination].  The explanation provided must be legally sufficient to

---

[23]     *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

justify a judgment for the [employer]." *Id.* at 160-61 (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 255 (1981)). "If the employer's evidence creates a genuine issue of fact, the presumption of discrimination drops from the case, and the plaintiff retains the ultimate burden of showing that the employer's stated reason for terminating him was in fact a pretext for retaliating against him for having taken protected FMLA leave." *Id.* at 161 (citing *McDonnell Douglas*, 411 U.S. at 804; *Burdine*, 450 U.S. at 257; *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)). "While a satisfactory evidentiary explanation by the employer for its actions destroys the legally mandatory inference of discrimination arising from the employee's prima facie case, the evidence and inferences that properly can be drawn from the evidence presented during the employee's prima facie case may be considered in determining whether the employer's explanation is pretextual." *Id.* (citing *Hicks*, 509 U.S. at 511).

Following *Hodgens*, the First Circuit has continued to apply the *McDonnell Douglas* burden-shifting analysis to FMLA claims. *Ameen v. Amphenol Printed Circuits, Inc.*, 777 F.3d 63, 68-69 (1st Cir. 2015); *McArdle v. Town of Dracut/Dracut Pub. Sch.*, 732 F.3d 29, 35 (1st Cir. 2013); *Pagán-Colón v. Walgreens of San Partricio, Inc.*, 697 F.3d 1, 8-9 (1st Cir. 2012) (appeal of denial of Rule 50 motion); *Henry v. United Bank*, 686 F.3d 50, 55 (1st Cir. 2012).

### C.    MFMLA Cases: The *Brady* Analysis

After the parties filed their memoranda, the Maine Supreme Judicial Court decided *Brady v. Cumberland County*, 2015 ME 143, 126 A.3d 1145, in which the Maine Law Court discarded the burden-shifting approach set forth in *McDonnell*

*Douglas* for purposes of summary judgment in Maine Whistleblower Protection Act (MWPA) cases. *Id.* ¶ 39 ("[A]pplication of the *McDonnell Douglas* framework to the summary judgment stage of [M]WPA retaliation cases . . . is unnecessary and only serves to complicate the proper analysis of the employee's claim"). The Maine Supreme Judicial Court explained that under Maine law, "the cause of action for whistleblower retaliation consists of three elements: (1) that the employee engaged in a protected activity; (2) that the employer took adverse employment action against the employee; and (3) that there was a causal connection between the two." *Id.* ¶ 32. Under this statute, an employee must meet all three elements in order to make out a prima facie case, and in doing so, the *Brady* Court reasoned that she would have "already presented a case that would be sufficient to go to a jury, and therefore one that is sufficient to defeat the employer's motion for summary judgment." *Id.* ¶ 34. Accordingly, the Law Court concluded that the *McDonnell Douglas* framework, "which would shift the burden of production back and forth *after* the employee had made out a case for retaliation, is unnecessary and only serves to complicate a proper analysis of the employee's claim." *Id.* ¶ 39 (emphasis in original).

The Maine Supreme Judicial Court's *Brady* ruling addresses only MWPA claims and the Law Court has not yet extended *Brady* to similar statutes. It is an open question whether *Brady* will apply to the Maine Human Rights Act, the state analogue to Title VII. *Id.* ¶ 34 ("This requirement serves to distinguish [M]WPA retaliation cases from Title VII cases"). However, to make out a FMLA claim, a plaintiff must prove "(1) [she] availed [herself] of a protected right under the FMLA;

(2) [she] was adversely affected by an employment decision; (3) there is a causal connection' between [her] protected activity and [the employer's] decision to terminate [her]." *Ameen*, 777 F.3d at 69 (quoting *Hodgens*, 144 F.3d at 161). The First Circuit has written that the same analysis governs both the FMLA and the MFMLA. *Colburn v. Parker Hannifin/Nichols Portland Div.*, 429 F.3d 325, 329 n.1 (1st Cir. 2005). Assuming the elements of a MFMLA claim track the elements of the FMLA, the MFMLA elements would also be identical to the MWPA—(1) protected activity, (2) adverse employment action, and (3) a causal connection between the two. *Interpretatio logica* concludes that the Maine Supreme Judicial Court would apply *Brady* to a MFMLA claim and discard the *McDonnell Douglas* framework for summary judgment purposes.

## VI.    DISCUSSION

### A.    The FMLA *McDonnell Douglas* Analysis

#### 1.    Prima Facie Case

To satisfy a prima facie case of unlawful retaliation under the FMLA, Ms. Cote must show "'(1) [she] availed [herself] of a protected right under the FMLA; (2) [she] was adversely affected by an employment decision; (3) there is a causal connection' between [her] protected activity and [the employer's] decision to terminate [her]." *Ameen*, 777 F.3d at 69 (quoting *Hodgens*, 144 F.3d at 161). "The burden of making out a prima facie case is 'not onerous.'" *Daigle v. Stulc*, 794 F. Supp. 2d 194, 237 (quoting *Mesnick v. General Elec. Co.*, 950 F.2d 816, 823 (1st Cir. 1991)).

Here, the Court easily concludes that Ms. Cote has met the requirements for a prima facie case as regards the retaliation claim. The first two elements are a given: she availed herself of protected rights under the FMLA and she was terminated by T-Mobile. As to the causal connection, timing, inconsistent explanations for her termination, comments in the workplace, and the hurried termination decision are, when combined, sufficient to sustain her prima facie burden of proof for the retaliation claim.

### 2.    The Burden of Production

Once the employee has made out a prima facie case, the "burden shifts to the employer 'to articulate some legitimate, nondiscriminatory reason for the employee's [termination],' sufficient to raise a genuine issue of fact as to whether it discriminated against the employee." *Hodgens*, 144 F.3d at 160 (quoting *McDonnell Douglas*, 411 U.S. at 802). Here, the Court also easily concludes that T-Mobile has met its burden of production.

Even though Ms. Cote vigorously argues that she was terminated because of the contents of her telephone calls with customers, which are not now available, the record reflects that Mr. Bowman was very concerned about the total amount of credits issued by Ms. Cote. The record states that she was issuing approximately $5,000 in credits per month, and that Mr. Bowman considered credits in the range of $400 to $600 per month to be high. DSMF ¶ 68; PRDSMF ¶ 68. Based on his review of the information, Mr. Bowman was concerned that Ms. Cote was able to increase her sales, and therefore her bonus, by adding features to customer accounts without charging

the customer for it, and because she was crediting the accounts, T-Mobile was not making any money on the features she was adding.  DSMF ¶ 69; PRDSMF ¶ 69.  Mr. Bowman concluded that Ms. Cote's conduct amounted to an offense against T-Mobile which warranted her termination.  DSMF ¶ 70; PRDSMF ¶ 70.

Thus, regardless of the admissibility of the content of the phone calls, T-Mobile has produced sufficient evidence to sustain its burden of production.

### 3.   The Plaintiff's Burden of Proving Pretext

The Court turns to the most critical part of the analysis: whether the employee has generated a genuine issue of material fact as to whether the employer's stated reason was pretextual.  "If the employer's evidence creates a genuine issue of fact, the presumption of discrimination drops from the case, and the plaintiff retains the ultimate burden of showing that the employer's stated reason for terminating him was in fact a pretext for retaliating against him for having taken protected FMLA leave." *Hodgens*, 144 F.3d at 161.  The First Circuit cautioned the district courts that "where a plaintiff . . . makes out a prima facie case and the issue becomes whether the employer's stated nondiscriminatory reason is a pretext for discrimination, courts must be 'particularly cautious about granting the employer's motion for summary judgment." *Kelley v. Corr. Med. Servs.*, 707 F.3d 108, 115-16 (1st Cir. 2013) (quoting *Hodgens,* 144 F.3d at 167).

### a.   Temporal Proximity

To resolve this part of the analysis, there are several guideposts that assist the court in determining whether a genuine issue of material fact exists.  One is a

33

temporal relationship between the assertion of a protected right and the adverse employment action. *Carrero-Ojeda*, 755 F.3d at 720; *Oliver v. Digital Equip. Corp.*, 846 F.2d 103, 110 (1st Cir. 1998) ("A showing of discharge soon after the employee engages in an activity specifically protected by [the law] is indirect proof of a causal connection between the firing and the activity because it is strongly suggestive of retaliation") (Title VII case).   Here, Ms. Cote claims the benefit of that inference because she called Ms. Mumley on August 29, 2012 to inform her that she would be taking her intermittent leave and that she would not be in that day, DSMF ¶ 57; PRDSMF ¶ 57, and on September 1, 2012, Mr. Bowman called Ms. Cote to join Ms. Mumley and himself in a conference room, accused Ms. Cote of fraudulent activity, and asked Ms. Cote for an explanation of the credits.  DSMF ¶ 71; PRDSMF ¶ 71; PSAMF ¶ 95; DRPSAMF ¶ 95.   On or about September 2, 2012, she was fired. PSAMF ¶ 96; DRPSAMF ¶ 96.

Ordinarily, the closeness between the assertion of the right and the termination, a matter of a few days, would be particularly strong evidence of retaliation.  Here, however, the inference is more muted.  *Carrero-Ojeda*, 755 F.3d at 720 ("[W]hile temporal proximity is one factor from which an employer's bad motive can be inferred, by itself, it is not enough—especially if the surrounding circumstances undermine any claim of causation").  The reason is that Ms. Cote had been on different types of FMLA leaves at T-Mobile every year since August 7, 2006, sometimes for extended intervals.  DSMF ¶ 21; PRDSMF ¶ 21.  In fact, as of August 2012, she had been on intermittent FMLA leave since November 30, 2011, which was

34

not scheduled to expire until September 20, 2012. *Id.* To infer that T-Mobile, which had granted Ms. Cote years of FMLA protected leave, would suddenly terminate her for taking two days of FMLA leave is less persuasive than the close temporal connection would ordinarily suggest. *Wright v. CompUSA, Inc.*, 352 F.3d 472, 478 (1st Cir. 2003) (quoting *Soileau v. Guilford of Me., Inc.*, 105 F.3d 12, 16 (1st Cir. 1997)) ("[C]hronological proximity does not by itself establish causality, particularly if '[t]he larger picture undercuts any claim of causation'").

### b.   Falsity of Employer Explanation

The United States Supreme Court has written that it "is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 147 (2000) (emphasis in original). The *Reeves* Court stated that "[i]n appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Id.*

Here, within two weeks of Ms. Cote's firing, Karen Estes from T-Mobile Human Resources supplied information to TALX, which in turn wrote the MDOL with an inaccurate reason for Ms. Cote's termination. PSAMF ¶¶ 98, 100; DRPSAMF ¶¶ 98, 100. This evidence is more compelling because Ms. Estes was involved in Ms. Cote's termination. She verbally signed-off on Mr. Bowman's decision to terminate Ms. Cote's employment, DRSAMF ¶ 127; PRDRSAMF ¶ 127, and participated with Mr. Bowman in the telephone call to Ms. Cote during which Ms. Cote was fired. PSAMF ¶ 96; DRPSAMF ¶ 96. Also, Ms. Estes sent a letter to Ms. Cote explaining the reason

35

for her termination only after T-Mobile's legal department had reviewed it.  PSAMF ¶ 101; DRPSAMF ¶ 101.

In keeping with *Reeves* and its progeny, T-Mobile's inaccurate explanation for its termination of Ms. Cote is some evidence of its retaliatory motive.  *Reeves*, 530 U.S. at 147-48 ("[T]he employer is in the best position to put forth the actual reason for its decision").

### c.     Pattern of Conduct

Although Ms. Cote claims that there is evidence that Ms. Mumley engaged in a pattern of conduct of disciplining FMLA employees, Ms. Cote produced only one other employee, namely K.W., as an example.  Two terminated employees is hardly a pattern.  *See United States v. Rivera-Maldonado*, 194 F.3d 224, 231 (1st Cir. 1999) (quoting *Stendebach v. CPC Intern., Inc.,* 691 F.2d 735 (5th Cir. 1982) ("[T]he smaller the sample size, the greater the likelihood that the [evidence] reflects chance")).  Furthermore, according to the record, T-Mobile employs approximately 400 people at its Oakland, Maine operation.  DSMF ¶ 1; PRDSMF ¶ 1.  Ms. Cote herself said that employees at T-Mobile would talk about the high number of workers on FMLA and that it was always a problem.  PSAMF ¶ 109; DRPSAMF ¶ 109.  In light of the large number of employees on FMLA and the small number of alleged violation of FMLA rights, the Court does not view Ms. Cote's pattern of conduct claim to support her retaliation claim against T-Mobile.

### d.     Employer Comments

"[N]egative comments, complaints, or expressions of reluctance by her superiors or co-workers about her FMLA leave-taking" may lead to the conclusion that the employer "took her FMLA requests or leave status into account when deciding to discharge her." *Carrero-Ojeda*, 755 F.3d at 720. There is some evidence in the record that T-Mobile was concerned about absenteeism, and Ms. Cote's former Coach, Greg Forney, had stated that when there are a number of people on FMLA it makes it harder for the people who are on the team that come to work every day. PSAMF ¶¶ 107, 110; DRPSAMF ¶¶ 107, 110. Mr. Forney also made comments about the high number of employees on FMLA on his team. PSAMF ¶ 108; DRPSAMF ¶ 108.

Although she could not recall a specific employee discussing it, the record suggests that FMLA leave-taking was a topic of conversation among her co-workers. PSAMF ¶ 109; DRPSAMF ¶ 109. The record indicates that when fewer employees are at work, it creates more work for those who are present; however, the burden on an individual Coach from the absence of a single employee appears to have been minimal. DSMF ¶ 19; PRDSMF ¶ 19; PSAMF ¶¶ 111-113; DRPSAMF ¶¶ 111-113.

The summary judgment record provides some evidence of negative employer comments about FMLA leave-taking from supervisors and co-workers. At the same time, the evidence is not particularly strong, especially since there is no indication that despite her long history of FMLA leave, any of these comments were directed against Ms. Cote.

### e.   The Employer's Inquiry before Termination

One issue is how the employer responded to the employee's alleged misconduct. In the words of the First Circuit, whether the employer's termination was "a disingenuous overreaction to justify dismissal of an annoying employee who asserted [her] rights under the ADA" or whether it was a "diligent adherence to protocol." *Kelley*, 707 F.3d at 118 (quoting in part *Miller v. Ill. Dep't of Transp.*, 643 F.3d 190, 200 (7th Cir. 2011)).   Here, Ms. Cote claims that T-Mobile's handling of her termination reveals its discriminatory motivation.

The Court agrees that T-Mobile's investigation and termination of Ms. Cote is one factor that a jury could consider in evaluating whether it reveals a discriminatory motive.   At the time of the investigation and termination, Ms. Cote had been employed at T-Mobile for about seven years.   The record reflects that in 2011, T-Mobile changed the role of the CSR to include a sales component and T-Mobile provided extensive sales training to its CSRs during 2011.  DSMF ¶ 9; PRDSMF ¶ 9; PSAMF ¶ 83; DRPSAMF ¶ 83.  Thereafter, T-Mobile placed the CSRs in an awkward position.  On one hand, T-Mobile expects them to make sales, authorizes them to issue courtesy credits to mollify customers irritated by T-Mobile, including its throttling practice, rewarded CSRs with bonuses if they achieved sales targets, and subjected them to discipline if they did not achieve the targets.  On the other hand, if the CSRs issued too many courtesy credits in an effort to achieve the sales targets, they were also subject to discipline.  T-Mobile enforced its "not too much, not too little" CSR performance expectations by the application of metrics, which tracked CSR performance.

In February 2012, Ms. Cote discovered the downside of failing to meet the sales targets, when her then Coach issued her a formal reminder, which is a second-level form of corrective discipline.  DSMF ¶ 33; PRDSMF ¶ 33.  According to the record, by April 2012, Ms. Cote's metrics began to improve and her formal reminder status expired in or about May 2012.  DSMF ¶ 38; PRDSMF ¶ 38.  On this point, according to the record, Ms. Cote's improvement was occasioned by her close adherence to T-Mobile-approved scripts and her consultation with T-Mobile co-workers.  DSMF ¶ 39; PRDSMF ¶ 39.

Then on August 29, 2012, three to four months after her corrective discipline status had been lifted, she asserted her right to FMLA leave and this caused Ms. Mumley to review her follow-ups and to conclude that Ms. Cote had issued $30,000 in credits since February 2012.  DSMF ¶¶ 57-60, 64; PRDSMF ¶¶ 57-60, 64.  Mr. Bowman later concluded that Ms. Cote had given about $5,000 per month in credits and the $30,000 figure corresponds to the six month period from March through August 2012.  *See* DSMF ¶ 68; PRDSMF ¶ 68.  However, Ms. Cote was under corrective discipline status from February to sometime in May 2012, DSMF ¶¶ 33, 38; PRDSMF ¶¶ 33, 38, and it is odd that, given her probationary status and the Coaches' constant review of actual telephone calls, PSAMF ¶ 118; DRPSAMF ¶ 118, her inappropriate extension of courtesy credits was not discovered until late August.

After Mr. Bowman and Ms. Mumley confronted Ms. Cote with allegations of fraud and played her a recording of a supposedly incriminating customer phone call, Ms. Cote defended herself by saying that she was doing what Mr. Forney and Mr.

Wright had told her to do.  Later, Mr. Forney, when asked about a specific telephone conversation, confirmed that he thought the supposedly incriminating phone call was consistent with T-Mobile procedure.  The record is contradictory and inconclusive, however, as to whether Mr. Bowman, who made the termination decision, asked Mr. Forney and Mr. Wright whether they agreed with Ms. Cote's claim that they had trained her to do what she was being fired for having done.

At the very least, the decision to fire Ms. Cote is sufficiently precipitous to raise a factual question as to whether it was "a disingenuous overreaction to justify dismissal." *Kelley*, 707 F.3d at 118.

### f.    Cat's Paw Inquiry

T-Mobile has another arrow in its quiver.   It argues that there is no evidence that Mr. Bowman, the person who made the termination decision, was even aware that Ms. Cote had taken FMLA-sanctioned leave.  It points out that Ms. Cote has admitted that "Mr. Bowman did not know that she was entitled to take intermittent FMLA leave and that Mr. Bowman did not know her prior to Ms. Mumley bringing Ms. Cote's conduct to his attention." *Def.'s Reply* at 1.  T-Mobile is correct as far as it goes.  A manager cannot be held to illegally discriminate against the employee for asserting a legal right if the manager was unaware that the employee ever asserted the right.  *See* DSMF ¶ 66; PRDSMF ¶ 66 ("Because Mr. Bowman managed six separate teams at that time, he did not know Ms. Cote nor did he know that she was entitled to take intermittent FMLA leave").

Even though Mr. Bowman may have been effectively insulated from any claim of his bias against Ms. Cote because of her FMLA status, the same may not be said for Ms. Mumley and Ms. Estes. *See Kelley*, 707 F.3d at 117 (quoting *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 55 (1st Cir. 2000)) ("One well-established method of demonstrating pretext is 'to show that discriminatory comments were made by the key decisionmaker or those in a position to influence the decisionmaker'"). Both Ms. Mumley and Ms. Estes were aware of Ms. Cote's FMLA leave status.

The question turns to whether either or both of them acted as the "cat's paw," improperly influencing Mr. Bowman. *See Awugah v. Key Bank Nat'l Ass'n*, No. 2:12-CV-97-DBH, 2013 U.S. Dist. LEXIS 33859, at *11 (D. Me. Mar. 12, 2013); *Harlow v. Potter*, 353 F. Supp. 2d 109, 117 (D. Me. 2005) (citing *Cariglia v. Hertz Equip. Rental Corp.*, 363 F.3d 77 (1st Cir. 2004)). "To invoke the cat's paw analysis, [Ms. Cote] must submit evidence sufficient to establish two conditions: (1) that [either Ms. Mumley or Ms. Estes, or both] exhibited discriminatory animus; and, (2) [Mr. Bowman] . . . acted as the conduit of [their] prejudice." *Harlow,* 353 F. Supp. 2d at 115.

Although the evidence of Ms. Mumley's and Ms. Estes' discriminatory intent is not overwhelming, it does not need to be in order to raise a triable question. Regarding Ms. Mumley, the record reflects that Mr. Bowman's conclusions about Ms. Cote's phone calls were based on Ms. Mumley's summary of Ms. Cote's phone calls that Ms. Mumley, not Mr. Bowman, had listened to. PSAMF ¶¶ 117, 126; DRPSAMF ¶¶ 117, 126. From these facts, a jury could find that Mr. Bowman's conclusions about

41

Ms. Cote's fraud were derived from information that Ms. Mumley, who had knowledge of Ms. Cote's FMLA status, had given him.

Next, Mr. Bowman concluded that Ms. Cote had defrauded T-Mobile of about $5,000 per month based on the information Ms. Mumley had given him. DSMF ¶ 68; PRDSMF ¶ 68 ("Mr. Bowman was very concerned about the credits issued by Ms. Cote because she was issuing approximately $5,000 in credits per month; he would consider credits in the range of $400 to $600 per month to be high"). Most significantly, Ms. Mumley informed Mr. Bowman that the total fraud was $30,000. DSMF ¶ 64; PRDSMF ¶ 64 ("Ms. Mumley pulled another report showing Ms. Cote's total adjustments issued since February 2012 and found that she had issued more than $30,000 in credits"). At $5,000 per month, Ms. Cote's fraudulent extension of courtesy credits would have begun in March 2012 and continued through August 2012. But, from at least March to or through May, 2012, Ms. Cote was in probationary status, was subject to oversight by her Coach, Mr. Forney, and had improved her performance, not by extending improper credits, but by closely following the T-Mobile recommended scripts. DSMF ¶¶ 38-39; PRDSMF ¶¶ 38-39. In short, a jury could conclude that Ms. Mumley was misleading Mr. Bowman about the length and cost of Ms. Cote's fraud.

The cat's paw case against Ms. Estes is more direct. T-Mobile admitted that before it terminated Ms. Cote, it obtained Karen Estes' verbal sign-off. DRSAMF ¶ 127; PRDRSAMF ¶ 127. Ms. Estes, as a member of the Human Resources Department, knew about Ms. Cote's FMLA status. PSAMF ¶ 121; DRPSAMF ¶ 121.

Indeed, on or about September 2, 2012, Ryan Bowman and Karen Estes called Ms. Cote and told her she was fired. PSAMF ¶ 96; DRPSAMF ¶ 96. Moreover, Ms. Estes was the source of misinformation to the MDOL about the reason for Ms. Cote's termination. PSAMF ¶ 102; DRPSAMF ¶ 102. ("Ms. Estes explained that the discrepancies between her initial report to MDOL and her October 5, 2012 letter to Ms. Cote were likely due to a "misspeak" based on information that she had done in the few days prior to her deposition"). A jury could find that Ms. Estes knew about Ms. Cote's FMLA status, was consulted before her termination, and misrepresented the true reason for her termination to a state agency.

### g.   Conclusion

The Court concludes that (1) temporal proximity, (2) the falsity of T-Mobile's explanation, (3) employer comments, and (4) the precipitousness of employer discharge combine to defeat T-Mobile's motion for summary judgment on Counts II and III because there are genuine issues of material fact that only a jury may resolve. Similarly, the Court concludes that there are genuine issues of material fact as to whether Ms. Mumley and Ms. Estes acted as cat's paws for Mr. Bowman's termination decision.

### B.   The MFMLA Claim

The Maine Supreme Judicial Court's *Brady* decision does not change the applicability of this Court's conclusion on the FMLA to Ms. Cote's MFMLA claim. If the FMLA count had not been asserted, the Court could have abbreviated this opinion by eliminating the shifting burdens analysis of *McDonnell Douglas* and evaluated

only whether, viewing the evidence in the light most favorable to Ms. Cote, she had stated a prima facie case against T-Mobile.  Based on its earlier analysis, the Court concludes that Ms. Cote has "presented a case that would be sufficient to go to a jury, and therefore one that is sufficient to defeat the employer's motion for summary judgment." *Brady*, 2015 ME 143, ¶ 34, 126 A.3d 1145.

## VII.   CONCLUSION

The Court GRANTS in part and DENIES in part T-Mobile USA, Inc.'s Motion for Summary Judgment (ECF No. 16).  The Court GRANTS T-Mobile USA, Inc.'s Motion for Summary Judgment as to Count One, but DENIES its Motion for Summary Judgment as to Counts Two and Three.

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE


Dated this 2nd day of March, 2016